UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KIERSTEN KING, ALICIA LOVE, NATASHA
MARTIN, LEATRICE SHACKS, BRANDIE
TYUS and SHYLENE WRIGHT,

    Plaintiffs,

v.

BOARD OF CONTROL OF EASTERN
MICHIGAN UNIVERSITY,

    Defendants.

Case No. 00-60466 (00-74284)
Honorable Marianne O. Battani

George B. Washington (P-26201)
Miranda K.S. Massie (P-56564)
SCHEFF & WASHINGTON, P.C.
Attorney for Plaintiffs King, Love, Martin,
Shacks, Tyuse and Wright
65 Cadillac Square—Ste 3800
Detroit, Michigan 48226
313-963-1921

Rosemary G. Schikora (P-38339)
Kiffi Y. Ford (P-54852)
Patrick F. Hickey (P-36648)
DYKEMA GOSSETT PLLC
Attorneys for Defendant EMU
400 Renaissance Center
Detroit, Michigan 48243
313-568-6538

## PLAINTIFFS' BRIEF IN OPPOSITION
## TO THE DEFENDANT'S RULE 12(h)(3) MOTION TO DISMISS

### INTRODUCTION

The United States Congress passed Title IX in order to "provide the long overdue legal framework to outlaw sex discrimination throughout our Nation's system of higher education." 1974 *Cong. Rec.* 39992 (Remarks of Senator Bayh, Title IX sponsor). Federal monies would no longer be used to fund or to support the deep and widespread discrimination against women which, Congress found, continued to stunt women's educational opportunity and to obstruct progress toward sex equality

As will be demonstrated below, Title IX was clearly and rightly meant to apply to circumstances like the ones here. This is a case about American women who enrolled in



a study abroad program fully devised and administered by an American university, and who were then subjected to a pattern of harassment and abuse by male American students while the EMU Professor leading the trip did nothing other than condone and tolerate the harassment that had occurred. It is absurd to suggest that Congress did not intend to protect the plaintiffs here and the tens of thousands of young women students in the Unites States who participate in trips, study abroad and other programs sponsored by American universities occurring in whole or in part outside the territorial limits of the Untied States.

## ARGUMENT

### I.  BACKGROUND PRINCIPLES.

Congress has the power to apply Title IX to extraterritorial conduct. *EEOC v Arabian American Oil Co.*, 499 US 244, 248 (1991) ("*Aramco*"). As a remedial civil rights statute, Title IX should be interpreted broadly so as to give full effect to the Congressional will to eradicate sex discrimination in federally funded programs. *See, e.g., Griffin v Breckenridge*, 403 US 88, 97 (1971); *Tcherepin v Knight*, 389 US 332, 336 (1967) ("remedial legislation should be construed broadly to effectuate its purposes").

The presumption against extraterritorial application of federal statutes invoked by EMU is not a substantive rule; that is, it expresses no underlying preference for territorial limitations. Instead, it is a rule of statutory interpretation: a tool designed to help courts discern what Congress intended in cases where, after other sources of Congressional intent are exhausted, there remains some "lingering doubt" over whether Congress intended to reach conduct beyond its physical borders. *Smith v United States*, 507 US 197, 204 (1993).

What Congress intended is first to be determined by examining "all available evidence about the meaning of [the statute]," *Sale v Haitian Centers Council, Inc.*, 509 US 155, 177 (1993). This includes the language and structure of the statute, the general legislative scheme, administrative and regulatory language and interpretation, and legislative history. *See, e.g., Smith, supra*, at 201-203 and n.4 (examining language, structure, and legislative history of statute before employing presumption against extraterritorial application to resolve remaining doubt); *Aramco, supra*, at 258 (examining EEOC's interpretation of statute in question).[1]

Here the inquiry leaves no doubt that Congress meant to ensure that colleges using federal funds did not discriminate against women in study abroad programs.

II. THE LANGUAGE AND STRUCTURE, LEGISLATIVE HISTORY, AND ADMINISTRATIVE INTERPRETATION OF TITLE IX ALL MAKE CLEAR THAT CONGRESS INTENDED TO REACH STUDY ABROAD PROGRAMS.

Analysis of the language and structure of Title IX leaves no doubt that Congress meant to reach study abroad programs. Further, the legislative history and administrative interpretation of the statute make the case for extraterritorial application overwhelming.

    A.    <u>Language and structure</u>

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance..." 20 USC §1681(a). EMU has not disputed that its "Intensive Educational

---

[1] As *Smith* and *Sale* make clear, the presumption against extraterritorial application is not a clear statement rule requiring explicit textual indication of intent to reach extraterritorial conduct in the statute itself. It is true that some dicta in *Aramco* suggest that approach. However, *Aramco* itself did not treat the presumption as a clear statement rule, instead examining material beyond the text of the statute, to wit, interpretations by the EEOC. Moreover, later cases—including *Smith* and *Sale*—unanimously reject a clear statement rule and employ a broader approach to Congressional intent. *See also, e.g., Kollias v D & G Marine Maintenance*, 29 F3 67, 73 (CA 2 1994).

3

and Cultural Program in South Africa" (hereafter "the South African program") was an "education program or activity receiving Federal financial assistance" for purposes of Title IX analysis. Instead, it has asserted that even if it is a program receiving such assistance, Title IX does not apply to conduct outside the territorial limits of the United States.

The statute's opening phrase, while a phrase of limitation, does not support the limitation EMU suggests. "No person in the United States" was intended by Congress not to exclude from protection otherwise protected women who were physically located outside of the United States, but rather to exclude an entire class of programs outside the range of Congressional concern with American education: foreign aid programs.

Title IX was modeled on Title VI of the Civil Rights Act of 1964, 42 USC §2000d *et seq.*, prohibiting race and national origin discrimination in programs receiving federal funding. *Cannon v University of Chicago,* 441 US 677, 694-696 (1979); *North Haven Bd of Education v Bell,* 456 US 512, 514 (1982). Thus, as is true of several other federal antidiscrimination laws, the language of Title IX is based on that of Title VI, which also begins with the phrase "[n]o person in the United States." See e.g. 15 USC §3151. It is the legislative history of Title VI which therefore defines the opening phrase of both statutes.

The House Report on Title VI is replete with language which makes the statute's breadth unmistakable, describing it, for example, as "prohibit[ing] discrimination in any Federal financial assistance program," and as "guarantee[ing] that there will be no discrimination among recipients of Federal financial assistance." 1964 *US Code Cong*

*and Adm News* 2391, 2394. The Civil Rights Act was intended to reach as far as Congress's power allowed with only few and defined exceptions.[2]

One of those exceptions provides the key to the meaning of "[n]o person in the United States" in Title VI and subsequently Title IX. Congress made clear in the House Report's Sectional Analysis that Title VI was not to apply to foreign aid programs:

> This title declares it to be the policy of the United States that discrimination on the ground of race, color, or national origin shall not occur in connection with programs and activities receiving Federal financial assistance...This title is not intended to apply to foreign assistance programs. 1964 *US Code Cong and Adm News* 2400.

Foreign aid programs discriminate on the basis of national origin as a matter of foreign policy. It is not surprising that the 1964 Congress did not wish to provide the citizens of, for instance, the Soviet Union with civil rights claims against United States foreign aid agencies. Indeed, that Congress found it necessary to forestall such improbable and far-flung claims by including this language of limitation in the statute and the House Report demonstrates how exceptionally comprehensive the statute's protections otherwise were.

When Title IX was passed eight years later, Congress patterned it closely on Title VI, changing the statutory language only to substitute sex discrimination for race and national origin discrimination. "No person in the United States" means to exclude foreign aid programs, not women who have crossed over the Ambassador Bridge on a field trip.

---

[2] The House Report describes the overall character of the Civil Rights Act of 1964 as a whole as "designed to protect and provide more effective means to enforce the civil rights of persons within the jurisdiction of the United States." 1964 *US Code Cong and Adm News* 2391. While "jurisdiction" has a secondary and derivative meaning associated with physical territory, its primary meanings—the right or power to apply and interpret the law; authority or control—are more abstract, as its etymology would suggest. *See, e.g., Webster's II New College Dictionary* (1995).

5

The rest of the language and structure evidence requires less extended discussion because it is so unambiguous.

First, when the statute prohibits discrimination in "*any* education program or activity receiving Federal financial assistance," it means what it says. "Any educational program" by definition includes this one: "[i]n construing a statute, especially a remedial one which must be construed broadly to effectuate its purpose, the word 'any' is generally used in the sense of 'all' or 'every' and its meaning is most comprehensive." *Niece v Fitzner*, 941 F Supp 1497, 1506 (ED MI 1996) (internal quotations omitted). Again, there is no dispute that EMU's South African program is an "education program or activity receiving Federal financial assistance." There should be, then, no dispute that it is covered by Title IX.

Second, the statute includes a list of exemptions which carefully define the limited circumstances under which it is *not* to be applied. 20 USC §1681(a)(1)-(9). Thus Title IX broadly governs "our Nation's system of higher education" except in the enumerated instances—which include religious and military institutions, fraternities and sororities, beauty pageant scholarships, and several other categories of varying degrees of idiosyncrasy and extensiveness.

The exemptions do not include study abroad programs because Congress did not wish to exempt such programs.

B. Legislative History

Senator Birch Bayh, the sponsor of Title IX, explained its purpose in a manner that is utterly incompatible with the view that the statute only applies within the physical territory of the United States:

6

> The purpose of Title IX is to provide for the women of America something that is rightfully theirs—an equal chance to attend the schools of their choice, to develop the skills they want, and to apply those skills with the knowledge that they will have a fair chance to secure the jobs of their choice...

118 *Cong Rec* 5808 (1972). *See Bell, supra,* 456 US at 526-527 ("Senator Bayh's remarks, as those of the sponsor of the language ultimately enacted, are an authoritative guide to the statute's construction.")[3]

The House Report made it equally clear that the scope of the statute was comprehensive:

> During the course of extensive hearings on higher education, much testimony was heard with respect to discrimination against women in our institutions of higher education...In view of the scope and depth of the discrimination illustrated to the Committee, the Committee bill [in what would become Title IX] prohibits discrimination in *any* education program or activity receiving Federal financial support.

1972 *US Code Cong and Adm News* 2511-2512 (emphasis added).

Again and again, the legislative history makes clear that Title IX applies to *all* federally funded programs—a sweep that Congress saw as mandated by the extent of the problem it was trying to solve. *See also, e.g.,* 1974 *Cong Rec* 39992; 1972 *Cong Rec* 24684; 1972 *US Code Cong and Adm News* 2671.[4]

Any interpretation of Title IX which seeks to impose a territorial limitation on its application to an American educational program is preposterous in light of this history. Trips abroad and study abroad programs are an integral and important part of higher

---

[3] The defendant apparently misunderstands the purpose of Title IX, referring to general funding-related language on the Education Amendments of 1972 overall as if it were directed at the anti-discrimination provisions of Title IX in particular. Defts Br 6; 1972 *US Code Cong and Adm News* 2462.
[4] The apparent lack of Congressional debate over extraterritorial application in general and study abroad programs in particular does not favor the view that the statute is limited to the physical territory of the United States. *Pfeiffer v Wrigley,* 755 F2 554, 559 (CA7 1985) ("we do not read into silence a deliberate rejection of extraterritorial application."). *See also Bell, supra,* 456 US at 520-521 (employees, who are neither explicitly included in nor excluded by the language of Title IX, are covered in light of the statute's broad purpose and in light of the natural meaning of the word "person.")

7

education in the United States.[5] They are offered by the large majority of universities and are understood to present students with unique opportunities for intellectual and social development. Trips and study abroad programs are aggressively marketed by colleges and other agencies because they are highly attractive and educationally significant. It would have been irrational and perverse had Congress elected to exclude them from coverage by Title IX—as irrational and perverse as would be the exclusion of a substantive field like English Literature or Latin American Studies; of an extracurricular activity like music or sports; or of some fundamental component of campus life like housing or work-study opportunities.

### C. Administrative interpretation

Title IX's implementing regulations also make plain that the Act was intended to be applied to study abroad programs.

Congress explicitly empowered all agencies providing federal funds to educational programs to promulgate Title IX enforcement regulations. 20 USC §1682. The regulations are entitled to "great deference." *Bell, supra,* 456 US at 522 n.12.[6]

The Title IX regulations annihilate whatever traces may remain of the defendant's argument. For example, the baseline regulation applicable to students provides as follows:

> Except as provided elsewhere in this part [and there is no provision contravening extraterritorial application], no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupational training, or other education

---

[5] A search for "study abroad" on google.com yields over 1,300,000 hits.

[6] When the Supreme Court declined to credit the EEOC's interpretation of Title VII in *Aramco, supra,* it did so because Congress had not explicitly granted the agency such rulemaking power in the statute and because it viewed the agency's position as having been inconsistent over time. These factors are reversed with respect to the Title IX regulations promulgated by the Department of Health, Education, and Welfare. *See Bell, supra, passim.*

8

program or activity operated by a recipient which receives Federal financial assistance. 34 CFR §106.31(a).

The purpose and coverage subparts similarly express the comprehensive character of Title IX, mandating the application of the statute to study abroad programs. 34 CFR §106.1; 34 CFR §106.11.

In addition, the Title IX regulations include a provision explicitly directed at foreign study! 34 CFR §106.31(c) regulates the administration of single-sex scholarships for study abroad, providing essentially that such scholarships be matched by similar opportunities for members of the other sex. The Department of Health, Education, and Welfare, which originally promulgated the implementing regulations, was clearly capable of making special provisions for study abroad in general—or, more to the point, of exempting it from coverage altogether. That it did not do so, and that Congress has never intervened to correct its position, makes the intent to cover study abroad even more indisputable.[7]

More generally, the policy behind the statute and the regulations is to prevent any use of federal funds to support sex discrimination in education, with the ultimate goal of eliminating discrimination in education, and by means of conditioning the receipt of federal funds on an agreement not to discriminate. EMU's argument is that it is no longer accountable to Congress and its policies once its students cross the border—that is, that it can take the money and run. That proposition is ethically outrageous and logically untenable.

---

[7] Further, other educational provisions in the Code of Federal Regulations deal with international programs, define student loan availability without reference to geography, and so forth. *See, e.g.*, 34 CFR 668.8; 34 CFR 690.6; 34 CFR 655.

9

III.   CONGRESS HAS REPEATEDLY EXPRESSED ITS WILL THAT CIVIL RIGHTS STATUTES BE CONSTRUED BROADLY *AND APPLIED EXTRATERRITORIALLY* BY OVERRULING CASES THAT NARROWED THE REMEDIAL REACH *OR THE GEOGRAPHIC REACH* OF CIVIL RIGHTS LEGISLATION.

When court decisions have narrowed the application or weakened the impact of civil rights legislation, Congress has repeatedly overruled them, making clear that such laws must be interpreted broadly to give effect to Congressional intent. More specifically, on both occasions when judicial use of the presumption against extraterritorial application has limited the geographic reach of civil rights statutes—the Age Discrimination in Employment Act (ADEA) and Title VII—Congress has reversed the courts.

After several Courts of Appeals limited the application of the ADEA to the physical territory of the United States by invoking the presumption, Congress amended the statute to make clear that its intent had been to eliminate age discrimination beyond the national borders and that it wished the statute to "apply to citizens of the United States employed in foreign countries by US corporations or their subsidiaries." 1984 *US Code Cong and Adm News* 2975. *See Aramco, supra,* 499 US at 258-259.

When the Supreme Court limited Title VII in the same way in *Aramco*, Congress once again, and promptly, overruled the judicial use of the presumption against territorial application to apply anti-discrimination norms beyond national borders. 42 USC §2000e(f) (defining an "employee" in the context of employment in a foreign company as a United States citizen); 42 USC §2000e-1(c) (applying Title VII to foreign companies controlled by American companies).

10

More generally, in the statute that overturned *Aramco*, the Civil Rights Act of 1991, Congress reversed several other Supreme Court decisions which had narrowed the scope of its civil rights legislation. 1991 *US Code Cong and Adm News* 694-696. The House Report angrily listed a series of previous Supreme Court decisions limiting the impact of its civil rights laws which it had previously had to overturn. 1991 *US Code Cong and Adm News* 626. It then continued:

> Despite these repeated expressions of Congress's view, the Supreme Court decisions of 1989 addressed in this legislation strongly suggest that the Supreme Court appears to have completely ceased applying [the broad] rule of construction in civil rights cases. *Departure from the established rules of construction, such as the rule favoring broad construction of civil rights laws, interferes with the ability of Congress to express its will through legislation.* Ibid.

There can be no serious doubt that Congress intended Title IX to apply to study abroad in general and to a situation like this one in particular.[8]

## CONCLUSION

After this case was filed in September 2000, the defendant waited 20 months before filing this jurisdictional motion. For the reasons set forth above, it is meritless, and the plaintiffs request that it be denied.

By Plaintiffs' Attorneys,
SCHEFF & WASHINGTON, P.C.

BY: /s/ Miranda K.S. Massie

Miranda K.S. Massie (P-56564)
65 Cadillac Square, Suite 3800
Detroit, Michigan 48226
(313) 963-1921

Dated: May 30, 2002

---

[8] The United States District Court for the Southern District of Indiana reached an erroneous interpretation of Congressional intent in its unpublished order in *Earlham v Eisenberg*. In addition, factual differences between the two situations mandate a different outcome here.

11

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KIERSTEN KING, ALICIA LOVE, NATASHA
MARTIN, LEATRICE SHACKS, BRANDIE
TYUS and SHYLENE WRIGHT,

    Plaintiffs,

v.

BOARD OF CONTROL OF EASTERN
MICHIGAN UNIVERSITY,

    Defendants.

Case No. 00-74284
Honorable Marianne O. Battani

---

George B. Washington (P26201)
Miranda K.S. Massie (P 56564)
SCHEFF & WASHINGTON, P.C.
Attorney for Plaintiffs King, Love, Martin,
Shacks, Tyus and Wright
65 Cadillac Square—Ste 3800
Detroit, Michigan 48226
313-963-1921

Rosemary G. Schikora (P-38330)
Kiffi Y. Ford (P-54855)
Patrick F. Hickey (P-36648)
DYKEMA GOSSETT PLLC
Attorneys for Defendant EMU
400 Renaissance Center
Detroit, Michigan 48243
313-568-6538

## CERTIFICATE OF SERVICE

George B. Washington hereby certifies that on May 30, 2002, he mailed a copy of Plaintiffs' Brief in Answer to the Defendant's Rule 12(h) Motion to Dismiss and Proof of Service addressed to:

    Rosemary G. Schikora
    Dykema Gossett
    400 Rennaissance Center
    Detroit, Michigan 48243-1668

enclosed in an envelope, bearing postage fully prepaid, and depositing same in a United States mail receptacle in Detroit, Michigan.

                                              GEORGE B. WASHINGTON